ROBERT R. POWELL, SBN 159747
SARAH E. MARINHO, SBN 293690
**POWELL & ASSOCIATES**
925 W. Hedding Street
San Jose, CA 95126
T: (408) 553-0201
F: (408) 553-0203
E: rpowell@rrpassociates.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (San Jose Division)

RIKKI MARTINEZ

                Plaintiff,

vs.

COUNTY OF SANTA CLARA, et al.

                Defendants.

Case No. 16-cv-05626-LHK

PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION

Date: November 1, 2018
Time: 1:30pm
Judge: Hon. Lucy H. Koh
Courtroom: 8

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION…………………….…………………………………………1

    A.  First Cause of Action (Cruel and Unusual Conditions of Confinement in Violation of Fourteenth Amendment: Excessive Force as to Jacquez, Torrez and Satariano; Failure to Protect as to Satariano, Dee, Quiro, and Wheeler)…………………  2

        1.   Excessive Force by Jacquez, Torrez and Satariano………………………..2

        2.   Excessive Force as to Wheeler as a Supervisory Defendant………………2

        3.   Failure to Protect as to Satariano, Quiro, Dee and Wheeler………………3

    B.  Third Cause of Action (*Monell* Liability as to County of Santa Clara - Cruel and Unusual Conditions of Confinement in Violation of Fourteenth Amendment)…...4

    C.  Sixth Cause of Action (Bane Act – California Civil Code § 52.1 as to Jacquez, Torrez, Satariano and County)……………………………………………………4

II.   SUMMARY OF PLAINTIFF'S ALLEGATIONS……………………………………5

    A.  What Jacquez Knew and Did Not Know at the Time He Used Force on Plaintiff – According to Jacquez…………………………………………………………..6

    B.  What Torrez Knew and Did Not Know at the Time He Used Force on Plaintiff – According to Torrez………………………………………………………………7

    C.  Video of Plaintiff's Beating Is The "Best" Worst Evidence……………………..7

    D.  The Practice and Custom of Excessive Force in County of Santa Clara Jail was the Moving Force Behind the Excessive Force on Plaintiff………………………….12

        1.   There is a Culture of Unchecked Excessive Force in the County Jail…….12

        2.   No Officers Received Counseling, Training or Discipline as a Result of this Beating……………………………………………………………………13

        3.   Salvadore Jacquez Should Have Been Fired Ten Years Ago, Instead He Remains a Training Officer………………………………………………13

III.  ARGUMENT……………………………………………………………………...15

    A.  Summary Judgment Standard……………………………………………………15

    B.  Excessive Force Standard………………………………………………………..15

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

1. The Amount of Force Used Far Exceeded Any Need for Use of Force….16

    a. Jacquez Used an Unreasonable Amount of Force When He Punched Plaintiff in the Head for Grabbing his Hand……………………..17

    b.  Torrez Used an Unreasonable Amount of Force When He Punched Plaintiff in the Head After Jacquez' Hand was Already "Free" and Plaintiff Was in a Vulnerable Position……………………………18

    c. Satariano Used an Unreasonable Amount of Force When He Forced Plaintiff Face Down onto the Metal Bunk and Got on Top of Him, While Plaintiff Yelled "I Can't Breathe!"………………………..18

2. Plaintiff Was Sent to the Hospital Due to the Beating by Defendants……18

3. Defendants Made No Effort to Limit the Amount of Force, Rather They Unreasonably Escalated the Use of Force Incident………………………19

4. The Alleged "Security Problem" Was Minor and Did Not Warrant Such a Brutal Response……………………………………………………………..19

5. The Officers Who Used Force Did Not Know Plaintiff Was Allegedly Assaultive………………………………………………………………………20

    a. What Jacquez Knew and Did Not Know at the Time He Used Force on Plaintiff………………………………………………………….20

    b. What Torrez Knew and Did Not Know at the Time He Used Force on Plaintiff………………………………………………………….20

6. Plaintiff Was Not Resisting Prior to, During, or After the Use of Force..20

C. Defendants Violated California Civil Code § 52.1, the Bane Act………………21

D. Failure to Protect Standard………………………………………………………22

E. *Monell* Liability………………………………………………………………22

IV. CONCLUSION………………………………………………………………..24

1
2
## TABLE OF AUTHORITIES

3
### FEDERAL CASE CITATIONS

4
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)……………………………………………15

5
*Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir.2016)………………………22

6
7
*Connick v. Thompson*, 563 U.S. 51 at 61 (2011)……………………………………………..22

8
*Fundiller v. City of Cooper City*, 777 F.2d 1436 (11th Cir. 1985)…………………………...23

9
*Graham v. Connor*, 490 U.S. 386 (1989)………………………………………………..…15

10
*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.1985)……………………………………23

11
12
*Hudson v. McMillian*, 503 U.S. 1 (1992)………………………………………………………18

13
*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015)……………………………………..2, 15, 16

14
*McRorie v. Shimoda*, 795 F.2d 780 (9th Cir. 1986)……………………………………………23

15
*Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978)………………..4, 22

16
*Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018)…………………………21, 22

17
*Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002)…………………………………..5

18
19
*Rodriguez v. County of Los Angeles*, 891 F.3d 776 (9th Cir. 2018)………….17, 19, 20, 21-23

20
### FEDERAL STATUTES

21
42 U.S.C.A. § 1983…………………………………………………………………………..3

22
### FEDERAL RULES AND INSTRUCTIONS

23
24
Ninth Circuit Model Jury Instructions………………………………………………………3

25
FRCP Rule 56(a)……………………………………………………………………………15

26
### CALIFORNIA CASE CITATIONS

27
*Bender v. County of Los Angeles*, 217 Cal. App. 4th 968 (2013)……………………………21

28
*Cornell v. City and County of San Francisco,* 17 Cal. App. 5th 766 (2017)…………………21

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

**CALIFORNIA STATUTES**

California Civil Code § 52.1 (Bane Act)……………………………………………4, 21

Cal. Gov't Code § 815.2………………………………………………………..5

Cal. Govt. Code § 3300-3312……………………………………………………4, 15

**OTHER AUTHORITY**

Judicial Council of California Civil Jury Instructions CACI No. 3066 (2017)……………..5

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

## I.    INTRODUCTION

On the afternoon of April 18, 2016, Plaintiff, a pre-trial detainee, was involved in an altercation with a correctional officer at County of Santa Clara Elmwood Correctional Facility in Milpitas, California. [Exh A to the Declaration of Sarah E. Marinho[1] at 41:3-5; 20:2-18] As a result of the altercation at Elmwood, Plaintiff was transported to the Main Jail on Hedding Street in San Jose.  [Exh B]

Not long after arriving at the jail, and despite being fully cooperative and compliant with all of the commands he was given, and with the entire booking and cell insertion videotaped, Plaintiff was severely beaten by Salvadore Jacquez and Adam Torrez within seconds after entering the cell while Jon Quiro, Jason Satariano, Eamonn Dee and Elmer Wheeler actively participated and/or failed to protect him from this excessive force as they piled on to hold Plaintiff defenseless, and sat mere inches away failing to even attempt to intervene.  [Exh C; Exh D]

Plaintiff submits that the most seminal fact it will present to the Court, for the video and the pictures of the aftermath of the beating delivered on Plaintiff will well establish the frightening level of the force that was used upon Plaintiff, is the fact that the sum total of what is alleged to have triggered the massive pummeling of Plaintiffs head and face, is that while being unshackled and on his knees facing the wall with his hands behind his back, he allegedly grabbed Jacquez's hand.  The claim by Defendants is that the Plaintiff, surrounded by five deputies – plus Sgt. Wheeler who was operating the video camera from the cell doorway – grabbed Jacquez' hand and would not let go, even after he had been driven down to a prone position on a metal bunk, and 400-plus pounds of grown men in full correctional officer attire were laying on top of him.

How Plaintiff somehow got his left hand which was fully encased within Jacquez's hand, to a position where he could even grab Jacquez's hand within a matter of two to three seconds is not a relevant inquiry – though certainly an interesting inquiry appropriate for

---

[1] All Exhibits referenced in this motion are attached to the Declaration of Sarah E. Marinho

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

another day.  For now, and for purposes of this motion, the question is whether the amount of force used on Plaintiff for this alleged transgression, *if taken as true* for purposes of determining this motion, was objectively unreasonable force. Indeed, the Defendants' own Watch Commander, Lieutenant Patrick Corso, later concluded it was excessive force upon his review of the video and that the involved officers and supervisor did not perform correctly [Exh E at County/06040]

The relief sought by this motion is summary adjudication of the First, Third and Sixth Causes of Action:

**A. First Cause of Action (Cruel and Unusual Conditions of Confinement in Violation of Fourteenth Amendment: Excessive Force as to Jacquez, Torrez, Satariano and Wheeler; Failure to Protect as to Satariano, Dee, Quiro, and Wheeler)**

Plaintiff's evidence is clear - the officers used excessive force on Plaintiff for 60 seconds while their colleagues and supervisor stood by and watched it happen without so much as a verbal intervention.

**1.  Excessive Force by Jacquez, Torrez and Satariano**

The elements required now for a finding of excessive force against Jacquez, Torrez and Satariano under § 1983 are:

a. As a matter of law, the amount of force used on Plaintiff was objectively excessive force in violation of Plaintiff's Fourteenth Amendment rights under *Kingsley* analysis:

i.  relationship between the need for the use of force and the amount of force used

ii.  extent of the plaintiff's injury

iii.  any efforts made to temper or to limit the amount of force,

iv.  the severity of the security problem at issue

v.  the threat reasonably perceived by the officer

vi.  whether the plaintiff was actively resisting.

### 2.   Excessive Force as to Wheeler as a Supervisory Defendant

The elements required now for a finding of excessive force against Wheeler as a supervisory defendant in his individual capacity under § 1983 are:

    a.   Wheeler acted under color of state law;

    b.   The acts of Wheeler's subordinates Jacquez, Torrez and Satariano deprived the Plaintiff of his particular rights under the United States Constitution as explained in later instructions;

    c.   Wheeler either,

        i.   set in motion a series of acts by his subordinates, or knowingly refused to terminate a series of acts by his subordinates, that he knew or reasonably should have known would cause the subordinates to deprive the plaintiff of these rights; OR

        ii.   Wheeler knew that his subordinates were engaging in these acts and knew or reasonably should have known that the subordinates' conduct would deprive the plaintiff of these rights; and

        iii.   Wheeler failed to act to prevent his subordinates from engaging in such conduct; and

    d.   Wheeler's conduct was so closely related to the deprivation of the Plaintiff's rights as to be the moving force that caused the ultimate injury. (Ninth Circuit Manual of Model Jury Instructions No. 9.4 (2017)).

### 3.   Failure to Protect as to Satariano, Quiro, Dee and Wheeler

The elements required now for a finding of failure to protect are:

    1. Defendants Satariano, Quiro, Dee, and Wheeler were present for the excessive use of force on Plaintiff and saw it occurring; and

    2.  Defendants Satariano, Quiro, Dee, and Wheeler had actual knowledge of the substantial risk of serious harm to Plaintiff during the excessive use of force by their colleagues; and

3. Defendants Satariano, Quiro, Dee and Wheeler did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendants' conduct obvious; and

4. By not taking such measures, the defendants caused Plaintiff's injuries.

**B.   Third Cause of Action (*Monell* Liability as to County of Santa Clara – Cruel and Unusual Conditions of Confinement in Violation of Fourteenth Amendment)**

The County is liable because it has ratified a custom of excessive force that allowed deputies Satariano, Quiro, Dee and Wheeler to stand by and fail to protect Plaintiff as their colleagues pummeled him about the head and face for a full minute while he lay face down, not resisting.  *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 690 (1978)

No one, not the aggressors nor the non-intervenors were disciplined or trained following the injuries suffered by Plaintiff.  The history of similarly situated inmate-beating correctional officers and deputies not being disciplined is well-documented and publicized in the County of Santa Clara.  The elements required now for a finding of *Monell* liability are:

1. The County has a custom and/or practice of excessive use of force which was the moving force behind the violation of Plaintiff's rights; or

2. The County has a custom and/or practice of failure to protect prisoners from excessive force which was the moving force behind the violation of Plaintiff's rights; and

3. The County adhered to the custom and/or practice with deliberate indifference to the constitutional rights of the prisoners.

**C.   Sixth Cause of Action (Bane Act - California Civil Code § 52.1 as to Jacquez, Torrez, Satariano and County)**

The Bane Act recognizes a private right of action for damages for interference with civil rights, such as the excessive force used by Jacquez, Torrez and Satariano on Plaintiff. (California Civil Code § 52.1).  Plaintiff claims that Jacquez, Torrez and Satariano

4

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

intentionally interfered with his civil rights by threats, intimidation or coercion and the violent beating he received.  The essential factual elements to establish this claim are:

1. That Jacquez, Torrez and Satariano acted violently against Plaintiff to prevent him from exercising his right to be free from excessive use of force.

2. That Plaintiff was harmed; and

3. That Defendant's conduct was a substantial factor in causing Plaintiff's harm. (Judicial Council of California Civil Jury Instructions CACI No. 3066 (2017)).

Since the conduct of Defendants occurred in the course and scope of their employment, Defendant County of Santa Clara is therefore liable to Plaintiff pursuant to *respondeat superior*. (Cal. Gov't Code § 815.2; *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002)).

## II.   SUMMARY OF PLAINTIFF'S ALLEGATIONS

On the afternoon of April 18, 2016, Plaintiff was alleged to have assaulted Deputy David Marichalar, a correctional officer who was using force on Plaintiff's cellmate at the Elmwood Correctional Facility.  [Exh F 50:3-12]  Defendant Jacquez is personal friends outside of work with Elmwood Deputy Marichalar. [*ibid*]  Due to the Elmwood incident, Plaintiff was transferred to a more restrictive housing environment at the Main Jail, where he arrived later that day around 9:10 pm [Exh B]  At 9:12 pm Sgt. Elmer Wheeler began video recording Plaintiff and kept the camera on through the use of force incident, which occurs only 7:45 minutes into the video. [Exh C - at elapsed time 07:45].

Plaintiff is seen and heard on the video from the beginning being completely compliant, saying "Yes, Sir" to every instruction.  Plaintiff is seen being escorted by Jacquez, Quiro, and Satariano from the basement of Main Jail up the elevator to the fourth-floor housing unit, while Wheeler continues to video-record the escort.  Once they are in the cell, Deputies Dee and Torrez join them.  Quiro removes Plaintiff's leg shackles and left handcuff.  Before the right handcuff is removed, Jacquez begins saying loudly, "let go of my hand," at 7:43 elapsed time, and by 7:50 Officer Jacquez punched Plaintiff about the head and face over and over with a closed fist [Exh C; Exh F 146:7-16].

Unnecessarily, Satariano got on top of Plaintiff while forcing him down face first on the bunk.  When Jacquez was done pummeling him, Torrez also punched Plaintiff at least twice, using well known (to jail personnel) "short punches." [Exh C 8:00 – 8:06]  For one full minute, the deputies were on top of Plaintiff while he lay face down on the metal bunk. During the attack Plaintiff urinated and defecated on himself but staff refused to give him clean pants.  [Exh A 72:9 – 74:1]  Plaintiff was examined by nurses at the jail and transported by ambulance to Valley Medical Center.  [Exh G]  At the hospital, a CT scan showed he had a retrobulbar hematoma and an emergency surgical procedure called a lateral canthotomy was performed by an ophthalmologist to save him from going blind.  [Exh H; Exh A 63:17 - 66:17]  Plaintiff suffered chipped teeth, contusions and swelling that lasted for weeks, and pain including headaches that persisted for about a year after the beating and scars that remain today. [*ibid;* Exh A 110:24 – 112:6; Exh I]  Plaintiff remained in the infirmary for about a week [Exh A 74:7-9]

### A. What Jacquez Knew and Did Not Know at the Time He Used Force on Plaintiff – According to Jacquez

Jacquez testified at deposition that at the time of the use of force incident, he did not know that Plaintiff had allegedly been assaultive on staff earlier in the day.  [EXH F 121:15-122:18; 144:22-145:13]  Jacquez learned only after the use of force incident that it was Plaintiff who had allegedly assaulted Deputy Marichalar.  [EXH F 145:14-21]  Jacquez only recalls learning that "there was an inmate in the basement that needed to come up to the fourth floor." [Ex. EXH F 51:4-15; 32:19-33:19]  Jacquez testified at deposition that from the time he first made contact with Plaintiff until he ordered Plaintiff to kneel on the bunk in the cell, Plaintiff was compliant and cooperative with his directives. [EXH F 128:20-129:7]  Based on this compliance, Jacquez – the ERT leader – decided not to do a formal cell insertion which would require Plaintiff to lay prone on the floor while his restraints are removed, but instead informally allow him to kneel on the bunk. [EXH F 128:18-129:7]

//

1  //

2  //

### B.  What Torrez Knew and Did Not Know at the Time He Used Force on Plaintiff – According to Torrez

Torrez testified he had spoken to no one at all before Plaintiff appeared on the 4th Floor where he was to be placed in a cell, and Torrez described Plaintiff as "cooperative and going with the program ("cooperative," Torrez said in both deposition, and in his description to a Sgt. Perez on the night of the incident).   [Exh J 48:10-49:19][2]  Torrez testified unequivocally he had no knowledge Plaintiff had been involved in an incident at Elmwood, knew not so much as a general rumor about the incident.  [Exh J 53:3-17]

### C.  Video of Plaintiff's Beating Is The "Best" Worst Evidence

Except as otherwise specifically noted, the entirety of the factual assertions in this section are evidenced by the video of the intake and cell insertion of Plaintiff at the Main Jail. The time segments are given for Exhibit C in **bold** for the specific representation that follows.

**0 – 4:20**  Plaintiff takes off his shirt, and several photos are taken of Plaintiff.  He is then led into the holding cell he had been standing in front of.  All of his cuffs/restraints are removed so they can change his clothes, then replaced.  **4:21** – Plaintiff is led to a cell on the Fourth Floor, in leg shackles and waist-chain handcuffs.[3]  **6:44** – Plaintiff is placed in the cell on the Fourth Floor.  **7:01** – Plaintiff is told to kneel on the bunk, which he does at the end neared the door to the cell.  He then places his face and chest against the wall to the right of the cell as one enters the cell.  Note the metal bunk is up against that rightmost wall upon entering the cell, and the head of the bunk is up against the far wall from the entrance to the

---

[2] Torrez did "guess" he learned it "after the fact" about the Elmwood incident. [Ex. Exh J 56:13-21]

[3] Waist-chain cuffs (or "waist-chains") consist of a metal chain worn around the waist to which handcuffs are attached by an extremely short chain, which keeps an inmate's hands at waist level. [https://en.wikipedia.org/wiki/Handcuffs; Ex. C]

cell, with possibly four feet from the end of the bunk near the cell door, to the wall of the cell door.

**7:02 –24** – Plaintiff's leg shackles are removed. **7:33** – Quiro commences removal of Plaintiff's wrists from cuffs on waist chain. However, only the left hand is freed from the cuff; note at no time is Plaintiff's right hand removed from the cuffs, as the assault begins within seconds of freeing the Plaintiff's left hand.  **7:34-38** –Plaintiff's relaxed left hand becomes visible in the video, and Jacquez says, "relax your hand," at which point the Plaintiff's left hand becomes visibly more relaxed and open. The hand is let go for about one second, and Plaintiff keeps it right where it was let go, and it remains relaxed and partly open (not clenched).

As **7:40** comes, Jacquez's left hand is on Plaintiffs' wrist, approximately four to five inches above the palm. **7:39-40** – At this point, Plaintiff's limp left hand is grasped by Jacquez's right hand, with Jacquez clasping *over Plaintiff's left thumb and outside of Plaintiffs furthest "pinky" finger – in other words, Jacquez has Plaintiffs thumb and fingers all within the palmar surface of Jacquez's right hand*.  Upon grasping Plaintiff's left hand entirely within the palm of Jacquez's right hand, Jacquez then immediately moves Plaintiff's left hand up and towards the middle of Plaintiff's back; all standard practices to this point (other than the manner in which the entire cell insertion was done – which was the furthest thing from standard practices or policy).  However, the full movement and final destination of the Plaintiff's clasped hand is not seen because the hands (both Plaintiff's and Jacquez's) disappear behind the left edge of Satariano's body and left arm and go out of view of the video camera as **7:39** becomes **7:40**.[4]

**7:41-44** – Jacquez starts saying, "Relax," immediately after the clasped hand of Plaintiff goes out of view, and says it immediately again, "Relax."  By ***7:43***, only three seconds after Jacquez's hand being clasped around Plaintiff's hand – outside of Plaintiff's hand – and moving it to some point up Plaintiff's back (toward his shoulder blades, a typical control

---

[4] It is apparently unclear to Jaquez which hand Plaintiff grabbed.  His report written promptly after the incident claimed first left hand and in the next paragraph right hand, and then back to his left hand.  In deposition May 17, 2017, he said it was left hand. [Exh F 64:8-65:7]

technique), Jacquez says, "Let go of my hand." Jacquez does not make the slightest attempt to "free" his hand from Plaintiff.  As these statements by Jacquez begin, Torrez starts to move and moves from a location closer to the cell door and video camera than Dee (the next closest), past Dee, and towards where Jacquez is located, standing to Jacquez' immediate right. Torrez stands now within a mere couple of inches from the edge of the bunk.  At the ***7:43-4*** mark, the shot allows a view of the top of Jacquez' right shoulder and a small bit of Jacquez' lateral surface of his upper right arm; no indication is seen that Jacquez is attempting to extract his hand from the alleged grip of the Plaintiff whether by purposeful effort, if not at least reflexive action, of actually pulling his hand out of Plaintiff's palm.  At no time during the incident can Jacquez be seen attempting to pull the hand he is claiming Plaintiff grabbed from Plaintiff's grip.

Jacquez repeats two more times in this span, "Let go of my hand," as he leans in towards Plaintiff who is now being forced by Satariano down the wall he had been facing to his left, while still kneeling on the bunk (it is a movement that will end eventually, with Plaintiff laying prone with his head face down on the bunk and correctional officers all over his back and legs).

By **7:44**, Satariano and Quiro are rapidly moving in tighter and/or on top of Plaintiff. **7:44-45** – Jacquez again says, "Let go of my hand," at *7:45*, when Torrez has now moved in so close to the left side of the bunk, that he is obscured virtually entirely by Dee (the Caucasian officer with glasses, closest to the video camera), and no part of Plaintiff  (spare a small piece of his red jail pants), can be seen past Dee and through the bodies of Torrez, Quiro, and Satariano (from left to right).  **7:46-7 -** Jacquez continues to say, "Let go of my hand" and/or "Let go," it is within these same two seconds that Plaintiff is completely pushed to a prone position on the bed.

At the **7:47** mark Plaintiff is face down on the bunk, and the following can be seen with complete clarity:

**1.** Quiro has raised his right leg up and slid the shin of his right leg over the back of the Plaintiff's knees; his position with only one foot left on the ground and the mass of his body

now completely over the bunk and the Plaintiff would indicate Quiro has virtually his entire body weight across the back of Plaintiff's knees. At the same time, Quiro is leaning forward and reaching forward with both arms toward Plaintiff's waist line.

**2.**   After pushing Plaintiff face down on the bunk, Satariano has leaped forward onto the fully prone body of Plaintiff (prone, excepting that Plaintiff's right hand is still in the waist-chain handcuff and the location of the left hand is not viewable), and Satariano has moved forward up the Plaintiff's body to such an extent that both of his feet and Plaintiff's feet are at the same location right at the end of the bunk.

**7:48 – 51** – Jacquez continues to repeat – now for approximately the entire prior 10 seconds, "Let go of my hand, let go of my hand."  Satariano crawls further up the right side of the bunk towards Plaintiff's head. By the time **7:51** comes, the sound of two blows to Plaintiff are clear.

**7:52-3** – In this two second span, Jacquez' right arm shows popping up and back down rapidly just behind the view at the top of the video, looking over the back of Torrez.  Torrez by the time of these two seconds has leaned in with his torso entirely over Plaintiff on the bunk. Based on the clear, if only fleeting view of the arm of Jacquez, a view that can only be seen when the video is stopped at the precise moment, it is clearly Jacquez's right arm based on the clear view of the bend in the arm which defines the elbow.  While Jacquez is continuing to yell, "Let go of my hand," which based on the last view of his hand would be his *right hand* that he clasped <u>*over*</u> <u>*the*</u> <u>*Plaintiff's left*</u> <u>*hand*</u> while Jacquez' left hand was on Plaintiff's left forearm– at the **7:39-40** mark, Jacquez is continuing to yell "Let go of my hand," with the occasional, "Let go of my fucking hand."

**7:54-7** – In the midst of these three seconds, Plaintiff can be heard to say, "I'm not touching you," amidst also crying and/or plaintively wailing.

**7:57-8:00** – During this segment, Jacquez leans back and then steps back a small bit, and then Torrez, who had been nearly shoulder to shoulder with Jacquez while leaned over Plaintiff on the bunk for a few seconds prior, slides in and over Plaintiff such that his head – reasonably estimated - is almost directly over Plaintiffs.

**8:00-8:06** – Now Torrez is seen fairly squarely from the back, leaned forward and over Plaintiff's head, and Torrez' shoulders rear up twice in short succession and the sound of two solid blows to Plaintiff are heard clearly.  During this time Jacquez says out loud twice, "stop resisting."  By this time Jacquez has clearly had his hand free for at least 10 seconds, based on the punches to Plaintiffs head he leveled during the time of **7:52-53**. Torrez had not yet had his chance to exact vengeance on Plaintiff, so he took that opportunity now.  Also during this time, at **8:01** Plaintiff is heard saying, "I didn't touch you."

**8:07-10** – As Plaintiff is smothered and punched about his head and face relentlessly in front of Wheeler, Wheeler tells Plaintiff, "you need to do what the deputies are telling you to do."  Meanwhile Jacquez is telling Plaintiff, "relax, so we can get your hands behind your head."  But as can be seen in the video, Plaintiff is later pulled up from the bed with his hands cuffed behind his back, not behind his head.  Of course, his right hand had been cuffed the entire time.

**8:11-13** – Plaintiff continues to cry and whimper loudly, while Wheeler says loudly, "get him cuffed."  **8:14-19** – Other sounds are heard that also sound like blows.  By Jacquez's own admission at deposition, he struck Plaintiff multiple times with a closed right fist. [Exh F 146:8-16]  **8:48** – Jacquez claims Plaintiff is "secure in cuffs." **8:49-8:54** – Plaintiff is heard simply crying and wailing.  Numerous times, starting at 8:16, Plaintiff yells in his muffled voice – face pressed into the bed and receiving numerous blows – "I can't breathe," "I can't breathe."

**8:55-9:19** – Plaintiff is heard yelling, "Help me, help me." **18:40** – Plaintiffs right eye is a bright red/purple and has already swollen shut; it is less than ten minutes since the beating.

**21:26** – Deep bruising can be seen all down the right side of Plaintiffs head.  By this time three different nurses/medical staff have become involved in Plaintiff's care.  **25:40-6** – Plaintiff is placed on a stretcher for transport to Valley Medical Center. **27:00** – The attending nurse on the scene, while Plaintiff is on the stretcher, states she cannot open the left eye, but the pupil in the right eye is "reactive."

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

### D.    The Practice and Custom of Excessive Force in County of Santa Clara Jail was the Moving Force Behind the Excessive Force on Plaintiff

The beating of Plaintiff cannot be examined in a vacuum.  There is a culture of excessive force among correctional deputies, and specifically Jacquez is known by the Sheriff's Office to have a long history of sustained misconduct, including multiple incidents of the use of excessive force.  Despite this history and the fact that the beating of Plaintiff took place after the publicized murder of Michael Tyree by correctional deputies, Jacquez testified at deposition that he could not recall being trained on use of force in the last five years. [Exh F 94:1-13].  At deposition, Torrez could not recall his last use of force training. [Exh J 37:19-25].

### 1.   There is a Culture of Unchecked Excessive Force in the County Jail

The deputies' conduct shocks the conscience and is indicative of the culture of lawlessness, abuse of power, and excessive force at the Santa Clara County Jail.  The jail fails to properly track inmate grievances; Captain Blanca Hoyt, the facility commander at the time of the beating of Plaintiff, testified in another prisoner beating case that inmate grievances are ***not*** tracked by deputy name, even though there is a mechanism to do so. [Exh K 46:1 – 52:10; 129:1 – 131:22].  Anyway, she also testified that she never generated reports based on the minimal information they did track, like date of incident, nature of complaint, race, housing unit and team (one of four shifts of correctional staff). [*ibid*]  This is despite the policy in effect at the time which required that she "review inmate grievance statistics at least once per quarter and generate a report based on his or her findings." [Exh L]

Internal Affairs Sergeant Jennifer Bice testified in another prisoner beating case that IA "does not go to the grievance level" when conducting investigations, meaning they do not pull prior grievances naming a particular officer to see what past allegations were made against him. [Exh M 87:9 - 89:10]  The Internal Affairs investigator in Plaintiff's case was retired captain Luther Pugh, who is also a licensed attorney.  [Exh N 24:3-19] In the materials he received to review in Plaintiff's case, there was a USB flash drive labeled "Jacquez old cases." [Exh N 43:19 – 44:4].  Pugh did not even look at the contents of the thumb drive because he thought that they

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

"were some summaries of cases involving Officer Jacquez... I did not think that they were relevant to the current case that I was investigating." [Exh N 44:2 - 46:8]

Undersheriff Carl Neusel emailed Pugh after receiving his conclusion that the excessive force allegations against Jacquez and Wheeler were not sustained, saying "nice report." [Exh N 48:21 – 50:2]

### 2. No Officers Received Counseling, Training or Discipline as a Result of this Beating

Internal Affairs failed to promptly investigate - they did their very first interviews after Mr. Martinez filed a lawsuit; it was not until a year after the event that Internal Affairs interviewed the involved deputies, except for Satariano who fell through the cracks due to the rushed investigation. [Exh N 72:10-25]   Jacquez testified at deposition that he did not receive any discipline or training at all as a result of the Rikki Martinez incident. [Exh F 94:1-13].  At deposition, Torrez could not recall his last use of force training. [Exh J 37:19-25].  Assistant Division Commander Tim Davis and Lieutenant Patrick Corso agreed that Wheeler needed further training due his supervisory lapses during the incident and Jacquez needed to be investigated for excessive force. [Exh O 19:24 – 21:5; 21:18 – 22:11; Exh E].  No one ever followed through with it and Wheeler was never verbally counseled let alone retrained.  [Exh O 26:7 – 28:18; 32:22 – 34:3; Exh P 96:25 – 97:16].  None of the deputies involved were disciplined or received training due to the beating of Plaintiff, in fact Satariano was promoted to a training officer. [Exh J 35:20-22; Exh Q 83:8-19; Exh R 104:3-21; Exh P 111:23-112:1].

### 3. Salvadore Jacquez Should Have Been Fired Ten Years Ago, Instead He Remains a Training Officer

Long before he brutalized Rikki Martinez, Jacquez was known to County as a problematic officer with a high number of excessive use of force allegations against him.  [Exh S].  Jacquez doubles down on his malicious conduct by testifying against prisoners and accusing them of being assaultive to him; Jacquez perjured himself in court during the preliminary hearing of Martinez, but the District Attorney's Office saw right through it and dismissed the case. [SEM Dec].

In June 2013, Michael Villapando reported to Mental Health and Internal Affairs that he had been punched in the face by Jacquez while handcuffed in his single cell, as retaliation for asking to speak to a sergeant after weeks of harassment by Jacquez.  [Exh T] Photos were taken of his swollen eye.  [*ibid*] The harassment had made him consider suicide since Jacquez had been making his life so difficult, including denying phone calls, throwing away family photos, hygiene items, and commissary, making homosexual remarks, denying him access to mental health for three weeks, entering his cell after lights out to threaten him, and withholding his mail. [*ibid*] Sgt. Grumbos and Sgt. Sepulveda interviewed Villapando and documented his injuries, but inexplicably, the case was closed due to "insufficient evidence."  [*ibid*]  Jacquez testified at deposition that he was never disciplined nor counseled by a superior regarding the Villapando incident.  [Exh F 82:25 – 83:23].

This sadistic conduct is not new - it is a pattern that County has been on notice of and failed to protect prisoners from.  Back on April 23, 2006, Jacquez threatened and assaulted Jose Alvarez causing a bruise in the shape of a hand on Alvarez' upper arm from where Jacquez grabbed him.  [Exh U].  Despite this being caught on video, and Jacquez failing to report his use of force, lying about it once confronted and defending himself by saying Alvarez was "mouthy," the jail still failed to discipline, train, or terminate Jacquez for this excessive force. [Exh U; Exh F 88___] Jacquez' disciplinary records indicate that he was given an 84-hour suspension as a result of the **ELEVEN[5]** sustained findings in the Alvarez incident, however Jacquez testified at deposition that he never knew of the suspension and **never served it!**  [Exh F 140:13 – 141:14; Exh V]  This is because County failed to impose the discipline within one year of discovering the

---

[5] DOC Policy 3.31.II.B - Brutality
DOC Policy 3.31.II.C - Improper touching
DOC Policy 3.31.1V.J.3.a - Excessive Use of Force
DOC Policy 3.31.1V.J.9a. - Conduct Unbecoming
DOC Policy 3.31.IV.J.1S.a - Discourtesy
DOC Policy 9.01.I.A.1 - Excessive Use of Force
DOC Policy 9.01.1I.B.1.a.&2. - Excessive Use of Force
DOC Policy 9.01.III.A.1.c. - Excessive UOF; Escalation
DOC Policy 9.27.I.BA.a - Failure to Report UOF
County Merit System Rule A2S-301.aA - Brutality in the performance of duties
County Merit System Rules A2S-301.b.1. - Gross Misconduct / Conduct Unbecoming

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

1    misconduct, as required by the Peace Officer Bill of Rights codified in Cal. Govt. Code § 3300-
2    3312 ("POBAR").  [Exh V]

3        Another Sheriff's Office employee with knowledge of Jacquez' history is Sgt. Eric Fields
4    #320; he was in his office near the Classification desk during the Alvarez incident, heard the
5    commotion and came out to investigate.  [Exh U].  He did not see the incident occur, but later he
6    viewed the video at the request of Sgt. Shawn Francis and knew the allegations made by Alvarez,
7    including the injuries that he suffered at the hands of Jacquez.  [*ibid*].  Sgt. Fields would later be
8    present and aware of Villapando's allegations of abuse by Jacquez in 2013. [Exh T]

## III.   ARGUMENT

### A.    Summary Judgment Standard

A party may move for summary judgment, identifying each claim or defense - or the
part of each claim or defense - on which summary judgment is sought. FRCP Rule 56(a).
Summary judgment is proper "if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law." *Id.* "Only disputes
over facts that might affect the outcome of the suit under the governing law will properly
preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247
(1986). Conjecture or speculation are insufficient to raise an issue of material fact. See, *Id.* at
249.

### B.    Excessive Force Standard

The Fourteenth Amendment applies to excessive force claims brought by pretrial
detainees.  Specifically, the Supreme Court has held, "It is clear … that the Due Process
Clause protects a pretrial detainee from the use of excessive force that amounts to
punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989).  More recently, in *Kingsley
v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015), the Supreme Court held that to prove an
excessive force claim under the Fourteenth Amendment, a pretrial detainee must only show
that the officers' use of force was objectively unreasonable; the detainee is not required to
show that the officers were subjectively aware that their use of force was unreasonable.

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

The *Kingsley* Court rejected a jury instruction that had included a subjective component in asking the jury to determine if the defendants, "used unreasonable force *and* acted with reckless disregard of [Kingsley's] rights." *Id.* 2476 – *emphasis* added by U.S.S.C. to original trial court jury instruction. This instruction coupled with an instruction that indicated that in determining whether there was "reckless disregard of [Kingsley's] rights the jury should consider "[w]hether [respondents] reasonably *believed* there was a threat to the safety of staff or prisoners." *Id.* 2476-7 - *emphasis* same. The *Kingsley* Court was clear, the standard that must be applied is "objective," and not "subjective" based on what an individual defendant's subjective intent or understanding may have been: "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 2473, citing *Graham*, at 396.

The *Kingsley* Court set forth the following non-exhaustive list of factors to evaluate whether the force used was unreasonable,

> 1) relationship between the need for the use of force and the amount of force used,

> 2) extent of the plaintiff's injury,

> 3) any efforts made to temper or to limit the amount of force,

> 4) the severity of the security problem at issue,

> 5) the threat reasonably perceived by the officer, and,

> 6) whether the plaintiff was actively resisting. Id. 2466

Exhaustive or not, these factors will be used to frame the inescapable conclusion that the force used on Plaintiff by the Defendants – particularly Jacquez, Torrez and Satariano for purposes of this motion – was unreasonable and excessive.

**1.  The Amount of Force Used Far Exceeded Any Need for Use of Force**

The Defendants position is that a partially shackled prisoner who is on his knees and restrained on one arm by a deputy and surrounded by five correctional staff members can be pummeled on the head for 60 seconds because, with his hands behind his back, he grabs the hand of one of them. Of course, the court knows that Plaintiff asserts that he absolutely did not grab or touch or hold any of the Defendants, but for the sake of argument Plaintiff entertains the scenario presented by Defendants here, and it still fails to be reasonable force.

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

### a.   Jacquez Used an Unreasonable Amount of Force When He Punched Plaintiff in the Head Multiple Times for Grabbing his Hand

Only seven seconds pass between when Jacquez first begins saying, "let go of my hand," before he punched Plaintiff about the head and face over and over with a closed fist [Exh C; Exh F 146:7-16].  The video is clear - he did not try to "free" his hand at any time.  It is common sense that a person's first instinct if their hand is truly suddenly grabbed would be to yank one's hand away with full force.  Additionally, it does not require an expert to know that an able-bodied male the size of Jacquez has physics on his side when Plaintiff has his hand behind his back (and bent at the elbow) and is on his knees with his other hand shackled!

In the recent Ninth Circuit decision *Rodriguez v. County of Los Angeles*, prisoners created a disturbance in a housing unit at Los Angeles County jail including lighting fires, flooding toilets, shattering sinks, and throwing shards of porcelain.  *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 787 (9th Cir. 2018).  Deputies responded with brute force and entered Rodriguez' cell, hitting, kicking and tasering him even after he was handcuffed and was not struggling.  *Ibid*.  There, like here, the prisoner was told to "stop fighting," while the excessive force was being used on him and he was not resisting. *Ibid*.  Even though Rodriguez was a pretrial detainee, his fellow plaintiffs were convicted prisoners and the claims were pursued as Eighth Amendment claims, instead of Fourteenth Amendment for Rodriguez.  Despite this higher burden at trial, Rodriguez prevailed, and the Ninth Circuit found that "the evidence amply supported the jury's finding that the deputies acted maliciously and sadistically."  *Id* at 797.

Plaintiff in this case only need prove that Jacquez objectively used unreasonable force, but even under the higher Eighth Amendment standard, the evidence is clear that Jacquez used force maliciously and sadistically for the very purpose of causing harm, and not for any legitimate penological reason.

*//*

*//*

*//*

Motion for Summary Adjudication
16-CV-05626-LHK
Martinez v. County of Santa Clara, et al.

**b.   Torrez Used an Unreasonable Amount of Force When He Punched Plaintiff in the Head After Jacquez' Hand was Already "Free" and Plaintiff Was in a Vulnerable Position**

Jacquez was "free" by the time Torrez hopped on top of Plaintiff (who was already underneath three other deputies) and began punching him on the head at least twice.  Satariano remained on top of Plaintiff's torso and right arm, Quiro was on top of his legs and Dee was assisting.  Surely any need for force had already passed, if it ever existed.

**c.   Satariano Used an Unreasonable Amount of Force When He Forced Plaintiff Face Down onto the Metal Bunk and Got on Top of Him, While Plaintiff Yelled "I Can't Breathe!"**

Satariano did not need to push Plaintiff down to the bunk, let alone get on top of him.  Satariano made no effort to help "free" Jacquez' hand.  He testified that he never saw Plaintiff grab Jacquez' hand [Exh Q 50:9-22].  Satariano proceeded to hold Plaintiff down so that his colleague could pummel him over and over again about the head and face.  This is objectively excessive force.  Even under the higher Eighth Amendment standard for convicted prisoners, excessive force is unconstitutional in the context of quelling a prison disturbance, and officers violated the Eighth Amendment where one officer "punched [plaintiff] in the mouth, eyes, chest and stomach while [another officer] held the inmate in place and kicked and punched him from behind." *Hudson v. McMillian*, 503 U.S. 1 at 4 (1992).  Here, Satariano forced Plaintiff face down onto the bunk and held him while Jacquez and Torrez beat his face and head, excessive under any standard.

**2.   Plaintiff Was Sent to the Hospital Due to the Beating by Defendants**

For one full minute, the deputies were on top of Plaintiff while he lay face down on the metal bunk.  During the attack Plaintiff urinated and defecated on himself but staff refused to give him clean pants.  [Exh A 72:9 – 74:1]  Plaintiff was examined by nurses at the jail and transported by ambulance to Valley Medical Center.  [Exh G]  At the hospital, a CT scan showed he had a retrobulbar hematoma and an emergency surgical procedure called a lateral canthotomy was performed by an ophthalmologist to save him from going blind.  [Exh H; Exh A 63:17 - 66:17]  Plaintiff suffered chipped teeth, contusions and swelling that lasted for

weeks, and pain including headaches that persisted for about a year after the beating and scars that remain today. [*ibid;* Exh A 110:24 – 112:6; Exh I]  Plaintiff remained in the infirmary for about a week [Exh A 74:7-9]

### 3.  Defendants Made No Effort to Limit the Amount of Force, Rather They Unreasonably Escalated the Use of Force Incident

Jacquez clearly never tried to pull his hand away from Plaintiff for the obvious reason that it was never held or grabbed by Plaintiff, but even if it had been, Jacquez failed to avoid the need for use of force and instead created a use of force incident; a jury will reach the same conclusion.  If Plaintiff truly had his hand, Jacquez reasonably should have tried to free himself rather than jump at the opportunity to use his hands as weapons, Level IV force pursuant to the Department of Corrections use of force policy in place at the time. [Exh W]  None of the other deputies make any effort to "free" Jacquez, and in fact none of them even claim to have seen Plaintiff grab Jacquez' hand (well, Torrez told an investigator a day or two after the incident that he had seen Plaintiff grab Jacquez' arm, but at deposition a year after the incident he had realized the right answer was "hand" not "arm." [Exh J 21:14 - 22:17]

Sgt. Wheeler, the supervisor and cameraman during the beating testified at deposition that all of the actions by the deputies under his command that day were pursuant to policy and that his deputies did not do anything that day that he disapproves of.  [Exh P 111:11-22].  Defendants will point to zero efforts made to limit the use of force.  They are lucky they did not kill him during this brutal and unnecessary encounter.

### 4.  The Alleged "Security Problem" Was Minor and Did Not Warrant Such a Brutal Response

The force used on Plaintiff was not part of a good-faith effort to maintain or restore discipline.  There was no security problem, just a simple battery was alleged.  Even under the higher standard of Eighth Amendment cases involving convicted prisoners, evidence that during a prison disturbance county sheriff's employees inflicted severe injuries on prisoners while they were not resisting was sufficient to establish a violation of the prisoner's right to be free from cruel and unusual punishment.  *Rodriguez v. County of Los Angeles*, 891 F.3d 776 at 795 (9th Cir. 2018);

### 5.   The Officers Who Used Force Did Not Know Plaintiff Was Allegedly Assaultive

Jacquez and Torrez both testified at deposition that they had no clue that Plaintiff had been assaultive at Elmwood earlier in the day:

### a.   What Jacquez Knew and Did Not Know at the Time He Used Force on Plaintiff

Jacquez testified at deposition that at the time of the use of force incident, he did not know that Plaintiff had allegedly been assaultive on staff earlier in the day.  [EXH F 121:15-122:18; 144:22-145:13]  Jacquez learned only after the use of force incident that it was Plaintiff who had allegedly assaulted Deputy Marichalar.  [EXH F 145:14-21]  Jacquez only recalls learning that "there was an inmate in the basement that needed to come up to the fourth floor." [Ex. EXH F 51:4-15; 32:19-33:19]  Jacquez testified at deposition that from the time he first made contact with Plaintiff until he ordered Plaintiff to kneel on the bunk in the cell, Plaintiff was compliant and cooperative with his directives. [EXH F 128:20-129:7]  Based on this compliance, Jacquez – the ERT leader – decided not to do a formal cell insertion which would require Plaintiff to lay prone on the floor while his restraints are removed, but instead informally allow him to kneel on the bunk. [EXH F 128:18-129:7]

### b.   What Torrez Knew and Did Not Know at the Time He Used Force on Plaintiff

Torrez testified he had spoken to no one at all before Plaintiff appeared on the 4th Floor where he was to be placed in a cell, and Torrez described Plaintiff as "cooperative and going with the program (the latter, regarding "cooperative," Torrez said in both deposition, and in his description to a Sgt. Perez on the night of the incident).   [Ex. Exh J 48:10-49:19]  Torrez testified unequivocally he had no knowledge Plaintiff had been involved in an incident at Elmwood, knew not so much as a general rumor about the incident.  [Ex. Exh J 53:3-17]

### 6.   Plaintiff Was Not Resisting Prior to, During, or After the Use of Force

As mentioned in subsections (5)(a) and (b) above, Plaintiff was compliant and cooperative during his entire interaction with Jacquez and Torrez until the alleged hand grab. When Jacquez is telling Plaintiff to relax his hand, Plaintiff is clearly confused, saying "it's relaxed," while his hand is clearly visible in the video and is relaxed.  Once the deputies are on

top of Plaintiff he is in a vulnerable state, face down on a metal bunk with at least three grown men on top of him, while his right arm remains shackled to his waist chains.  He was not physically in a position to resist, even if he were so inclined.  Anyhow, the video clearly shows that he is not resisting at any point.

### C.  Defendants Violated California Civil Code § 52.1, the Bane Act

For all of the reasons stated in subsection (B) above regarding excessive force, and the malicious and sadistic conduct seen on the video, Plaintiff has offered enough evidence for the court to summarily adjudicate his sixth cause of action, violation of the Bane Act by Jacquez, Torrez and Satariano.  The Bane Act recognizes a private right of action for damages for interference with civil rights, such as the excessive force used by Jacquez, Torrez and Satariano on Plaintiff.  (California Civil Code § 52.1).  Plaintiff claims that Jacquez, Torrez and Satariano intentionally interfered with his civil rights by threats, intimidation or coercion.  The essential factual elements to establish this claim are:

1.  That Jacquez, Torrez and Satariano acted violently against Plaintiff to prevent him from exercising his right to be free from excessive use of force.

2.  That Plaintiff was harmed; and

3.  That Defendant's conduct was a substantial factor in causing Plaintiff's harm.

While upholding the jury verdict on the Bane Act claim in *Rodriguez*, the Ninth Circuit analogized the plaintiffs' facts to those in *Bender v. County of Los Angeles*, calling them "remarkably similar" and found "most strikingly, deputies yelled "stop fighting" as they were beating Bender even though he was not fighting or resisting." *Rodriguez, supra*, 891 F.3d 776 at 801, citing *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968, 975 (2013).

The court in *Rodriguez* also cites another California Court of Appeal case that "recently confirmed 'that the use of excessive force can be enough to satisfy the [Bane Act's] 'threat, intimidation, or coercion' element.'" *Rodriguez, supra*, 891 F.3d 776 at 801, citing *Cornell v. City and County of San Francisco,* 17 Cal. App. 5th 766 (2017).  Finally, the Ninth Circuit discusses its recent decision in *Reese v. County of Sacramento*, "where we addressed a Bane Act claim premised on an alleged Fourth Amendment excessive force violation" and held that

"*Cornell*'s interpretation of the Bane Act was consistent with the statutory language and the California Supreme Court's decisions." *Rodriguez, supra*, 891 F.3d 776 at 802, citing *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018).

### D.  Failure to Protect Standard

Defendants Satariano, Dee, Quiro and Wheeler stood by while Jacquez and Torrez pummeled Plaintiff about the face and head for 60 seconds.  Defendants Satariano, Quiro, Dee, and Wheeler were present for the excessive use of force on Plaintiff and saw it occurring.  As the video makes clear, Defendants Satariano, Quiro, Dee, and Wheeler had actual knowledge of the substantial risk of serious harm to Plaintiff during the excessive use of force by their colleagues and did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved.  Not once will you hear anyone, including the supervisor Wheeler, even attempt to verbally stop the vicious assault.

### E.  *Monell* Liability

Defendants seriously injured Plaintiff by using excessive force during the cell insertion on April 18, 2016.  Plaintiff has also produced evidence that the same deputies and their colleagues have injured many other prisoners during ERT activations, cell extractions and other interactions in the housing units.

In *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir.2016) (en banc), the Ninth Circuit held that the deliberate indifference inquiry is objective. "Deliberate indifference" requires proof that a municipal actor disregarded a known or obvious consequence of his action. The County continues to fail to train despite hundreds of injuries, hospitalizations and deaths in its jail facilities.  *Connick v. Thompson*, 563 U.S. 51 at 61 (2011) ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."); *see also Castro*, 833 F.3d at 1077 (discussing constructive notice for

entities). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62

Plaintiff's proof of multiple similar instances of excessive force is evidence supporting a policy or custom of condoning unconstitutional force by the County of Santa Clara, through its Sheriff's Office, since Sheriff's Office officials took no steps to reprimand or discharge the involved deputies, or since they otherwise failed to admit the deputies' conduct was in error. *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 787 (9th Cir. 2018); see also *McRorie v. Shimoda*, 795 F.2d 780 (9th Cir. 1986); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir.1985) and citing *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985))

In order to prevail on his § 1983 claim against Defendant County of Santa Clara alleging liability based on a Sheriff's Office policy of failure to train its deputies, Plaintiff must prove each of the following elements:[6]

1. The acts (or failure to act) of one or more of the deputies involved in this incident deprived a plaintiff of his particular rights under the United States Constitution as explained in later instructions;

2. Defendants Jacquez, Torrez, Satariano, Quiro, Dee and Wheeler acted under color of state law;

3. The training policies of the defendant County of Santa Clara Sheriff's Office were not adequate to train its deputies to handle the usual and recurring situations with which they must deal;

4. The defendant County of Santa Clara Sheriff's Office was deliberately indifferent to the known or obvious consequences of its failure to train its deputies adequately; and

5. The failure of the defendant County of Santa Clara Sheriff's Office to provide adequate training caused the deprivation of Plaintiff's rights by one or more of the deputies involved in this incident; that is, the defendant's failure to train is so closely

---

[6] Elements are from the Ninth Circuit Manual of Model Jury Instructions No. 9.8 (2017), which also gives a definition of deliberate indifference, "'Deliberate indifference' is the conscious choice to disregard the consequences of one's acts or omissions. The plaintiff may prove deliberate indifference in this case by showing that the defendant County of Santa Clara knew its failure to train adequately made it highly predictable that its deputies would engage in conduct that would deprive persons such as Plaintiff of his rights."

related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

The lack of any training, punishment or discipline for these kinds of acts, is a moving force behind these kinds of brutal beatings occurring over and over again.  This failure to train or discipline is the reason that these COs are emboldened to abuse prisoners with impunity.  The County has been on notice for over a decade regarding Jacquez' history of excessive force allegations and the lack of discipline or corrective training has allowed him to continue abusing prisoners.

## IV.   CONCLUSION

Hospitalizing someone for grabbing of a hand is unreasonable and excessive force by any standard.  Due to the presented outrageous facts and clear authority, Plaintiff seeks summary adjudication of the First, Third and Sixth Causes of Action.


**RESPECTFULLY SUBMITTED**


DATED:  August 10, 2018                             /S/Sarah E. Marinho
                                                    SARAH E. MARINHO
                                                    Attorney for Plaintiff